J-A02022-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.L.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1077 WDA 2025 |

Appeal from the Decree Entered August 19, 2025
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  2025 AD-5

BEFORE:  STABILE, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: January 16, 2026**

W.L.M. (Father) appeals from the decree granting the petition to involuntarily terminate his parental rights (TPR petition) to his biological son, A.J.M. (Child), born in August 2021, which was filed by Child's biological mother, M.J.W. (Mother), and her husband, J.R.W.M. (Stepfather) (collectively, Petitioners), and terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).  After careful review, we affirm.

Mother and Father were romantically involved from March to November 2020.  N.T., 8/15/25, at 15.  In November 2020, prior to Child's birth, Mother and Father separated; however, Father acknowledged paternity by signing Child's birth certificate in August 2021.  ***Id.*** at 14, 16.  After Child's birth, Mother and Father maintained minimal contact, and Mother, exclusively, provided and cared for Child.  ***Id.*** at 19-21.  In June 2022, Mother filed a

custody petition in Huntingdon County, Pennsylvania. *Id.* at 22. On June 27, 2022, a Huntingdon County court awarded Mother sole legal and physical custody of Child. *Id.* at 22-23; TPR Petition, 6/18/25, ¶ 14.[1]

Petitioners became romantically involved in December 2021, and married in March 2025. Petitioners filed the instant, counseled TPR petition on June 18, 2025. Therein, Petitioners averred that Father "has evidenced a settled purpose of relinquishing any parental claim to [C]hild; [Father] has failed to perform any parental duties on behalf of [C]hild; [and] Petitioners are the only parents that [C]hild has ever known[.]" TPR Petition, 6/18/25, ¶ 17; *see also* 23 Pa.C.S.A. § 2511(a)(1).[2] Petitioners further averred that Father "has not had, or attempted to have, any contact with [C]hild since October 20, 2021[,]" and "there is absolutely no bond in existence between [Father] and [Child]." *Id.* ¶¶ 18, 19.

The orphans' court scheduled a hearing on the TPR petition for August 15, 2025. On June 27, 2025, the orphans' court issued an order directing the Bedford County Sherrif's Department to transport Father, who was then incarcerated at the state correctional institution (SCI) in Houtzdale,

---

[1] At the TPR hearing, Father testified that he posted bail on the date of the custody hearing, but was unable to attend because he "ended up not getting out of jail until 4:30 [p.m.] that day." N.T., 8/15/25, at 80.

[2] Although not explicitly pled in their TPR petition, at the TPR hearing, Petitioners argued that Father's parental rights to Child should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). N.T., 8/15/25, at 88-89.

Pennsylvania, to the Bedford County Courthouse for the TPR hearing. The same day, the orphans' court appointed separate counsel to represent Father and Child.[3]

Father appeared at the TPR hearing, in person, represented by counsel. Petitioners appeared, both represented by their counsel. Child, approximately four years old at the time, did not appear, but was represented by counsel, who indicated no conflict existed between Child's best and legal interests. **See** N.T., 8/15/25, at 4-5; **see also id.** at 4 (Child's counsel indicating that she was unable to ascertain Child's preferred outcome due to Child's age); **In re T.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests[.]"). Based upon Child's counsel's representations, the orphans' court found that Child's counsel could represent Child's best and legal interests

---

[3] Child's counsel served as both legal counsel and guardian *ad litem* (GAL). **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020) ("[W]here an orphans' court has appointed a GAL/Counsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict."). As noted below, the orphans' court found that no conflict existed between Child's best and legal interests. **See id.** at 1235-36 ("We emphasize that appellate review of this question does not involve second-guessing whether GAL/Counsel in fact had a conflict, … but solely whether the orphans' court made the determination in the first instance.").

without conflict. *Id.* at 6. The evidentiary presentation consisted of testimony from Petitioners and Father.

Concerning the dissolution of their relationship, Mother testified that, leading up to November or December 2020, Father subjected Mother to mental and physical abuse. N.T., 8/15/25, at 15-16; *see also id.* at 16 (Mother testifying that, in November 2020, Father broke her mobile phone and slashed the tires of her car, "so I could not leave or call anybody to come get me."); *id.* at 78 (Father admitting to slashing Mother's tires). Mother testified that Father continued to threaten her after their relationship ended, causing Mother to file a protection from abuse (PFA)[4] petition in June 2021. N.T., 8/15/25, at 11-12, 16. According to Mother, Father failed to appear at the scheduled PFA hearing and, based upon her testimony, the court entered a three-year PFA order (the PFA order) prohibiting Father from communicating with Mother. *Id.* at 12; *see also id.* (Mother confirming that Child was not a protected party under the PFA, and that communication between Father and Child was permissible).

Mother explained that since Child's birth, Mother has been Child's sole caretaker. *Id.* at 13. Although Father was present for Child's birth, Mother testified that Father had "[v]ery little" involvement with Child thereafter. *Id.* at 17. Mother stated that Father's last contact with Mother regarding Child

---

[4] 23 Pa.C.S.A. §§ 6101-6122.

was in October 2021. *Id.* at 17, 25; *see also id.* at 18 (Mother testifying that she had maintained the same mobile phone number, which Father used to communicate with Mother prior to their relationship ending). Mother testified that, in the two months following Child's birth, Father "saw [Child] a couple times[,] and [Father] would come to where I was living [with Child] for a little bit[.]" *Id.* at 17-18. According to Mother, in October 2021, Father's contact with Child ceased due to Father's illegal drug use. *Id.* at 19; *see also id.* (Mother testifying that she witnessed Father using heroin); *id.* (Mother testifying that Father stopped attempting to contact Child, and that Mother was unwilling to permit Father around Child while Father was abusing illegal drugs).

Mother continued that, since October 20, 2021, Father had not attempted to speak with Child on the phone or through the FaceTime application, and had not sent Child any letters until approximately two weeks prior to the TPR hearing. *Id.* at 26-27. Mother testified that Father never gave Child a holiday or birthday gift, and that Father had never provided Mother with any financial support for Child. *Id.* at 28.

Mother explained that Petitioners and Child have resided in the same household "as an intact family" since December 2021. *Id.* at 30; *see also id.* at 30-31 (Mother testifying that Petitioners and Child had resided with Child's maternal grandmother until December 2023, and that they moved out

after purchasing a house). Mother testified that both she and Stepfather are employed and contribute to the household's income. *Id.* at 29.

Regarding Child's relationship with Stepfather, Mother testified that Child "just loves [Stepfather]. [Child] calls him dad. [Child] loves to go fishing with [Stepfather]. [Child] loves going to the playground with [Stepfather, and t]he arcade. [Stepfather has] taken care of [Child] since day one." *Id.* at 31; *see also id.* at 31-32 (Mother testifying that she does not believe Child shares an emotional bond with Father, and that Child has never asked about Father). Mother testified that Petitioners intend to file a petition for Child to be adopted by Stepfather if the orphans' court granted Petitioners' request to terminate Father's parental rights. *Id.* at 32.

On cross-examination, Mother acknowledged that Father fed and diapered Child "a handful of times" before Father's contact with Child ceased in October 2021. *Id.* at 34. Mother further agreed that there were periods of time when she had blocked Father's phone number so that he could not communicate with her. *Id.* at 36-37; *see also id.* at 42 (Mother testifying that she blocked Father's phone number because he was threatening her; noting that Father had been text messaging her from several different phone numbers). Mother explained, however, that she had not had Father's phone number blocked during, at least, the year preceding the TPR hearing. *Id.* at 38.

Stepfather testified that he assisted Mother in raising Child since Child's birth, and that he shares a father-son bond with Child. *Id.* at 49. Stepfather testified that he and Mother have a two-year-old son, S.M., Child's half-brother, who resides with Petitioners and Child. *Id.* at 50. Stepfather explained that he views both Child and S.M. as his children. *Id.*; *see also id.* at 51 (Stepfather testifying, "I would love to adopt [Child].").

Father testified that he is currently serving an aggregate sentence of 6½ to 24 years in prison for possession of a controlled substance with the intent to deliver, fleeing or attempting to elude law enforcement, and receiving stolen property.[5] *Id.* at 57. Father believed that he will be eligible for parole in July 2029. *Id.* Father acknowledged his history of drug abuse, and indicated that he was waitlisted for the SCI's drug treatment and batterers intervention programs. *Id.* at 58-59; *see also id.* at 59 (Father testifying that he is currently on the waitlist for the aforementioned programs because he is "not in priority of going home anytime soon"); *id.* at 77-78 (Father admitting that, during his period of drug use between January 2021 and January 2022, he did not seek drug treatment, and overdosed on heroin several times, which required medical intervention).

Father testified that he resided with Mother at Child's maternal grandmother's house for approximately a month after Child's birth. *Id.* at 60.

---

[5] 35 P.S. § 780-113(a)(30); 18 Pa.C.S.A. §§ 3733(a), 3925(a).

During that time, Father testified that he diapered, fed, and spent time with Child. *Id.* Father testified that he left maternal grandmother's residence because of a disagreement he had with maternal grandmother concerning one of his dogs. *Id.* Father disputed Mother's claim that he and Mother's relationship had ended prior to Child's birth, instead indicating that he had simply moved out and that he and Mother continued their relationship. *Id.* at 61. Father agreed with Mother that he has not seen Child since October 2021, but claimed that Mother "had blocked me on everything and wouldn't let me be in contact with [Child]." *Id.* at 62.

Father testified that he was incarcerated in the Blair County Jail from January to June 2022. *Id.* at 64-65. From jail, Father testified, he called Mother to inquire about Child. *Id.* at 64. In June 2022, Father posted bail and was released. *Id.* at 65. In April 2023, Father was reincarcerated, and has since remained incarcerated. *Id.* When out of jail, Father indicated that he had unsuccessfully attempted to communicate with Mother about Child through one of his cousins, because Mother had blocked Father's phone number. *Id.* at 66. ***But see id.*** (Father testifying that he believed that the PFA order prohibited his contact with both Mother **and** Child, and that he did not make further efforts to contact Child "just because of the PFA"); *id.* at 70 (Father testifying that he learned that his cousin only attempted to contact Mother once and, in that communication, had asked Mother to send cousin or Father money).

Father acknowledged that he had not sent gifts to Child or financial support to Mother, claiming he was unable to due to his incarceration. *Id.* at 67. *But see id.* at 84 (Father claiming that he provided Mother financial support in 2021, "around the time that [Father] and [Mother were] still associating."). Father further claimed that he "didn't know [Mother's] address up until just recently when I got the paperwork in the mail for" the TPR proceedings. *Id.* Father testified that, on an undisclosed date, he attempted to send a letter to Child at maternal grandmother's residence, but it was returned because Father did not recall the correct street address. *Id.*

Father admitted that Child would not recognize Father at the time of the TPR hearing. *Id.* at 84. However, Father indicated, "I'm trying to do my best. I hope to get out [of prison] and do better in life[,] and would like to rekindle my relationship with [Child]." *Id.* at 68.

At the conclusion of testimony, Child's counsel/GAL recommended that the orphans' court terminate Father's parental rights:

> [Father] said [Child] would not know who [Father] is. There's no connection, because [the] last time [Father] saw [C]hild was in October 2021. … [F]ather willingly admits [he performed] no parental duties since that time period. And with [Petitioners'] testimony, there is no connection. There w[ere] individuals that were taking care of parental duties. … [W]hen I met with [C]hild, he was a happy child. [Child] just chose not to speak to me. But, I saw no issues when I met with [Child]. … [Child] seemed happy and fine.
>
> [U]nder the circumstances, I think [termination] would be in [C]hild's best interest, because the length of time, and … I do have a real concern about [F]ather making no attempt [at] reaching out[ to Child]. … [Father] admits that he got a copy of

- 9 -

the PFA [o]rder. [Father] did not remember what it stated. Whether [Child's] name was on the PFA [order]. [Father] took no steps to find out if he could contact [Child].

… [I]f [Father] had money to obtain heroin, then he could probably contact an attorney to find out if he had a right to … reach out to [C]hild. And [Father] did send [Child a] letter, obviously after the PFA ended, so he had … access to mail.

*Id.* at 87-88 (some paragraph breaks omitted; punctuation modified).

After hearing argument from Petitioners and Father, the orphans' court issued its ruling from the bench, terminating Father's parental rights to Child.[6]

Father, though represented by counsel, timely filed a *pro se* notice of appeal. Noting Father's *pro se* notice of appeal did "not comply with the Pennsylvania Rules of Appellate Procedure in multiple regards," on September 2, 2025, the orphans' court directed Father's counsel to consult with Father and, if Father so desired, file an amended notice of appeal. Order, 9/2/25. Thereafter, Father timely filed a counseled amended notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. On September 23, 2025, the orphans' court filed a Rule 1925(a) opinion directing this Court to the reasoning it stated on the record at the conclusion of the TPR hearing.

Father raises the following issue:

Whether [t]he [orphans'] court erred/abused its discretion in determining Petitioner[s] had established a legal basis for terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. §[ ]2511(a)(1), as the [orphans' c]ourt failed to give appropriate

---

[6] Although the decree terminating Father's parental rights is date-stamped August 18, 2025, the decree was not filed with the clerk of courts until August 19, 2025.

weight to [Mother's] efforts to thwart the father-son relationship, and, as such, the [orphans' c]ourt's finding is not supported by the record[?]

Father's Brief at 5 (punctuation modified).

We review the termination of parental rights for an abuse of discretion. *See Interest of N.A.S.*, 338 A.3d 191, 196 (Pa. Super. 2025). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)); *see also In re Adoption of C.P.D.*, 324 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial

court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)).

In his sole issue, Father argues that, based upon the evidence presented at the TPR hearing,

> it was obvious that Mother was erecting barriers to Father's contact with [C]hild. [Mother] freely admitted it was her intent to prevent contact between [Father] and [C]hild. [Mother's] given reason was Father's drug use, but there was no attempt to allow [Father] to see [C]hild in a safe manner. For example, [during visits Father] could have been supervised by family members, [Mother] herself, or [Mother] could have required [Father] to provide negative drug screens. None of those reasonable alternatives appear in the testimony.[7]

Father's Brief at 12 (footnote added).

According to Father, his "incarceration and indigency hampered him in overcoming the barriers to contact [] Mother had set[,]" and Father "did not have the financial ability to file for custody[,] consult with an attorney, or send cards or gifts." *Id.* Ostensibly in the alternative, Father also claims that his mistaken interpretation of the PFA order impeded his ability to contact Child. *Id.* at 12-13. *But see*, *e.g.*, N.T., 8/15/25, at 63-64 (Father claiming that he communicated with Mother regarding Child when he was incarcerated in January 2022, prior to the expiration of the PFA order).

---

[7] We note that Father presented no evidence that he requested such accommodations.

Father "freely admits that his drug addiction played a role in preventing a relationship with" Child, but insists that he has made strides towards rehabilitation while incarcerated. Father's Brief at 13-14. Father concludes that, "[b]ecause of his [rehabilitative] efforts, [Father's] failure to perform parental duties should be excused, and the lower court's order should be overturned." *Id.* at 14.

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of C.S.*, 327 A.3d 222, 237 (Pa. Super. 2024) (quoting *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*)). This Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order

- 13 -

to affirm the termination of parental rights." ***Int. of M.E.***, 283 A.3d 820, 830

(Pa. Super. 2022) (citation omitted).

Section 2511(a)(1) provides as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

This Court has stated that to meet the requirements of Section

2511(a)(1),

"the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the [t]ermination [p]etitions, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child." ***Id.*** (quoting ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1998)).

***In re Adoption of B.G.S.***, 245 A.3d 700, 706 (Pa. Super. 2021) (citations

modified); ***see also E.D.M.***, 708 A.2d at 91 ("Section 2511[(a)(1)] does not

require that the parent demonstrate both a settled purpose of relinquishing

parental claim to a child *and* refusal or failure to perform parental duties."

(citation omitted; emphasis in original)).

The Pennsylvania Supreme Court has explained that

our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. **The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.**

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (emphasis added; internal citations, quotation marks, and brackets omitted).

In applying Section 2511(a)(1),

[t]he court should consider the entire background of the case and not simply[] mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re Adoption of A.C.*, 162 A.3d 1123, 1129 (Pa. Super. 2017) (citations and ellipses omitted; formatting modified). However, the General Assembly's emphasis on the six months immediately preceding the filing of the petition indicates the timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

Finally, this Court has recognized that

[w]here a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, **a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a**

- 15 -

**relationship with his … child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children**.

Where a non-custodial parent is facing termination of his … parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his … child. **Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances**. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

*In re B.,N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004) (internal citations omitted; emphasis added). The *B.,N.M.* Court further stated that "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *Id.*

Instantly, the orphans' court concluded Petitioners proved, by clear and convincing evidence, that termination of Father's parental rights was merited under Section 2511(a)(1). N.T., 8/15/25, at 105. Rejecting Father's argument concerning the purported barriers to performing parental duties for Child, the orphans' court supplied the following analysis:

Parental duty requires that the parent acts affirmatively with [a] good faith interest in the child …, and not yield to every problem or barrier in order to maintain the parent-child relationship to the best of his or her ability. Even in the most difficult circumstances[, involving] drug addiction and/or incarceration, which we have in this case. …

[] In his argument, [Father] raised the issue of barriers ….
[Father] has not performed any sort of parental duties[. E]ven,
at best, if there were any performed[, t]here may have been a
few weeks' worth of parental duties performed when [] Child was
two months old back in October of 2021. But … the testimony is
clear, everybody agrees, since then, there's been no performance
of parental duties on the part of [Father].

….

Now, in this case, for [] frankly quite a long period of time
that I heard about today, [Father] was incarcerated. [Father] was
incarcerated from January of 2022 until June of 2022. At which
point, he [was released on bail]. And then, [Father] was
reincarcerated upon … the resolution of his pending charges in
April of 2023, and he has remained incarcerated since then. And
[Father] will remain incarcerated at the very least [] until, at the
earliest, July of 2029. That's probably the best case scenario.

….

… A couple things [] were noteworthy to the court.
Certainly, [Father] had, at least during parts of [his] incarceration,
[] the ability to make telephone calls. We know that because in
May of 2022, [Father] called [M]other from the Blair County
Prison. [Mother] testified that [Father] did not ask about [Child].
But I'm going to be frank, one phone call, even if [Father] did ask
about [] Child, that seems insufficient to this court, and that's if I
believe it.

… Certainly, these days [prison inmates] have access to
mail, telephones. In some cases, the ability to do FaceTime.
There's no testimony as to whether [Father] tried that or whether
[SCI-Houtzdale] allows that. But the state correctional institution,
I would submit that most of them do. …

… It seems to me that there has been [] little to no
affirmative action on the part of Father. [Father] did say … he
sent a letter at one point to [maternal grandmother's] address,
but he thinks he might have had the house number wrong,
because it [was returned to sender]. Well, that's fine. I
understand that. But it was what he did after that to further
pursue it, which was nothing. [Father] easily could have had a

- 17 -

family member get on their phone and do a very simple free white pages search for an address. [Father] could have simply had [a family member] drive [to maternal grandmother's residence] … to get the house number. There were a lot of things that [Father] could have done, but he didn't. So that's certainly concerning for the court.

….

… I'm really just not seeing [] Father doing much at all to remain in [] Child's life. To maintain any sort of relationship with [] Child. … I understand [Father] testified that over th[e last] couple years, he didn't have a lot of money, but … money really wasn't a barrier. [Father] could easily have taken steps. I understand folks say, hey, I didn't have the money to go hire an attorney to pursue [custody], but you don't need an attorney. There[ are] forms they give you for free at the courthouse. You fill it out, … and I have no doubt that [Father is] familiar with the [*in forma pauperis* filing] process, because he [has] quite a long criminal record.[8] …

[] There was a little bit of back and forth [at the hearing] about, at various times, temporarily it sounded like, [] Mother may have blocked [Father's phone number]. She realized [Father] was calling and she had concerns. … [Mother] believed that [Father] was using heroin at the time, which [Father] acknowledged, [and Mother] wasn't facilitating contact. But it was because of safety concerns, which I think was justified by [Father's] own testimony. But [Mother] also said, yeah, I would block [Father] and then unblock him. And [Mother is] certain that [Father] hasn't been blocked for well over a year. And [Mother's] cell[ ]phone number has been the same.

N.T., 8/15,25, at 95-103 (capitalization and punctuation modified; some paragraph breaks omitted; footnote added).

_____

[8] On cross-examination, Father admitted to a history of numerous criminal convictions, including several *crimen falsi* offenses. N.T., 8/15/25, at 73-75.

- 18 -

Regarding Father's claim that his cousin contacted Mother to inquire about Child at Father's request, the orphans' court determined that "asking a family member to contact [Mother]," "over the course of these several years, is [] inadequate, as far as overcoming obstacles in order to maintain a place of importance in [C]hild's life." *Id.* at 104.

The orphans' court's factual findings are supported by the record, and we agree with its legal conclusion. We discern no abuse of the orphans' court's discretion in the weight it afforded Mother's purported acts to thwart Father's efforts to maintain a relationship with Child. *See Interest of K.T.*, 324 A.3d at 56 (stating that "we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion." (citation omitted)).

Our review confirms that, since October 2021, Father performed no parental duties, and made virtually no effort to maintain a relationship with Child. Moreover, the orphans' court acted within its discretion when it credited Mother's testimony that she did not attempt to stifle Father's relationship with Child, and that Mother only prevented Father's contact with Child during periods where Father's heroin use presented a threat to Child's safety. *See C.P.D.*, 324 A.3d at 24 (observing that "all conflicts in testimony are to be resolved by the finder of fact." (citation omitted)); *see also* N.T., 8/15/25, at 28 (Mother denying that she attempted to prevent Father from having contact

with Child). Accordingly, Father's sole issue on appeal is without merit and entitles him to no relief.

Although Father does not challenge the orphans' court's Section 2511(b) analysis, we address the issue nonetheless. *See C.L.G.*, 956 A.2d at 1010 (considering the trial court's Section 2511(b) analysis despite the appellant not raising the issue).

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citation omitted). Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* at 1104 (citation omitted). However,

- 20 -

"the parental bond is but one part of the overall subsection (b) analysis." *Id.*

at 1113.

> [B]ond, plus permanency, stability and all "intangible" factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of "primary" importance in the Section 2511(b) analysis. … [A]lthough the parental bond is a major aspect of the Section 2511(b) analysis, it is nonetheless only one of many factors to be considered by the court, in addition to the intangibles such as love, comfort, security, and stability. Moreover, the court must consider whether, in the context of all these factors, the parental bond is necessary and beneficial to the child.

*Id.* at 1109 (citations and some quotation marks omitted); *see also In re*

*T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) (stating that "courts must keep the

ticking clock of childhood ever in mind. Children are young for a scant number

of years, and we have an obligation to see to their healthy development

quickly.").

Here, the orphans' court explained as follows, concerning its Section

2511(b) analysis:

> [T]here is no emotional bond between [Father] and [C]hild. As such, I find that there would be no effect on [C]hild [by] permanently severing that bond[, s]imply because [C]hild isn't even aware of [Father]. If [Child] passed [Father] on the street, [Child] wouldn't recognize [Father].
>
> On the other hand, we have [Stepfather], who has been there for [nearly] the entirety of [C]hild's life …. In that time, [Stepfather has] consistently been in [C]hild's life, consistently served as a father figure[,] and did what I would probably call, sometimes the heavy lifting of parenting of just being there on a day-to-day basis and … comforting [Child] when he wakes up in the middle of the night, making [Child] feel safe, providing for [Child]. Providing food, clothing, financial support.

….

> [] I think there is a very strong emotional bond [between Child and Stepfather].  I also think [termination of Father's parental rights is] in [C]hild's best interest, simply because [Child] is in … an intact family.  [Child] has a sibling, he has [M]other[,] and he has who he believes is his father[, *i.e.* Stepfather]. [Child] deserves that stability and continuity.

N.T., 8/15/25, at 106-07.

The orphans' court's findings are supported by the record, and we discern no error in its legal conclusion.  ***See Interest of K.T.***, 324 A.3d at 56.  Again, Father disputes neither the lack of a bond between Father and Child, nor the existence of a beneficial bond between Stepfather (who is an adoptive resource) and Child.  Accordingly, Father is entitled to no relief.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

1/16/2026

- 22 -